# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs November 8, 2012

### IN RE AUSTIN L. A.

**Appeal from the Circuit Court for Greene County**
**No. 11A044TJW     Hon. Thomas J. Wright, Judge**

**No. E2012-00662-COA-R3-PT - Filed January 3, 2013**

This appeal concerns a termination of parental rights. Custodial Parents filed a petition for adoption and termination of Mother and Father's parental rights to the Child. The trial court terminated Mother and Father's parental rights, finding that there was clear and convincing evidence to support several statutory grounds of termination and that the termination of parental rights was in the best interest of the Child. The Parents appeal the court's best interest finding. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which, CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Joseph O. McAfee, Greeneville, Tennessee, for the appellant, Ashley A.[1]

Whittney N. L. Good, Bulls Gap, Tennessee for the appellant, Jerry L. A.

Roger A. Woolsey, Greeneville, Tennessee, for the appellees, Carl D. S., Jr. and Vicky R. S.

Leslie E. Douthat, Greeneville, Tennessee, guardian ad litem for the minor, Austin L. A.

---

[1]It is the policy of this court to identify the last names of those involved in termination proceedings by initial.

# OPINION

# I. BACKGROUND

Jacob, Jerrick, and Austin ("the Child") were born to Ashley A. ("Mother") and Jerry L. A. ("Father") on May 5, 2003, June 6, 2006, and August 10, 2007, respectively. Mother had one other child, Shelly, who was born on September 12, 2001. Father also had another child, but he, along with Mother, primarily provided for Shelly, Jacob, Jerrick, and the Child (collectively "the Children"). This appeal relates to the termination of Mother and Father's parental rights to the Child; therefore, the factual background will mostly contain information pertaining to the Child.

Mother and Father (collectively "the Parents") had ongoing issues that impeded their ability to care for the Children. It was specifically alleged that the Parents abused pain medication, ingested illegal substances, and abused alcohol. As a result of their inability to properly care for the Children, the Department of Children's Services ("DCS") became involved with the family well before the Child was born. The most recent DCS intervention that actually related to the Child occurred on May 20, 2009, when DCS filed a petition to declare the Children dependent and neglected. DCS sought either the implementation of a court-ordered safety plan and placement with relatives or temporary legal custody of the Children. DCS alleged that on May 8, 2009, Father agreed to give temporary custody of the Children to family members. He released Jerrick and the Child to Julia L. ("Grandmother"), and he released Jacob and Shelly to Karen G. ("Aunt"), the maternal great aunt. Father agreed to release custody of the Children because he believed he would be charged with several criminal offenses and because Mother was "running from the law" at the time of the meeting and would likely be arrested at some point.

The trial court agreed with DCS's recommendations, appointed a Guardian ad Litem, and entered a safety plan, which provided for the placement of the Children as requested by DCS. The court ordered the Parents to complete an alcohol and drug assessment, a mental health assessment, parent education classes, and homemaking education classes. The court ordered Father to submit to a medication evaluation and ordered the Parents to cooperate with the service providers and comply with corresponding recommendations.

A review hearing was held on June 24, 2009, at which it was discovered that Mother had notice of the hearing but failed to appear. The court found that the current placement of the Children was appropriate and that the goal of reunification through noncustodial services also remained appropriate. The court found that the Parents were not in compliance with the safety plan, while DCS was in compliance and was making reasonable efforts to assist the Parents in their reunification efforts.

A review hearing was held on July 29, 2009, at which DCS reported that Father had attended the first appointment of the alcohol and drug assessment but that neither parent had completed any of the recommendations of the court ordered safety plan. Grandmother alleged that she had taken Mother to an inpatient drug rehabilitation program but that Mother left the premises the next day. Grandmother also alleged that she "was having health problems" and could not continue providing for Jerrick and the Child. DCS attempted to complete a home study on Maxine T., the paternal grandmother. DCS could not approve Maxine T. as a custodian because she allowed the Parents to visit the Children without supervision. Aunt agreed to care for the Children until the Parents completed the requirements contained in the safety plan. In consideration of DCS's report, the court awarded custody of the Children to Aunt.

In November 2010, Aunt informed DCS that she was "no longer physically or financially able to care for" the Children. DCS completed several home studies on potential placements and eventually approved the placement of Shelly with Aunt, Jerrick with Grandmother, Jacob with Maxine T., and the Child with Carl D. S., Jr. and Vicky R. S. (collectively "Custodial Parents"). The court granted legal and physical custody of the Children to their respective custodians by order, entered on December 15, 2010.[2] The court closed the case and instructed the custodians to facilitate sibling visitation.

On March 24, 2011, Custodial Parents filed a petition for adoption of the Child and corresponding termination of Mother and Father's parental rights to the Child. The grounds asserted for termination were abandonment, failure to comply with the conditions of the court-ordered safety plan, and the persistence of conditions that led to the Child's removal.

A hearing on the petition was held over the course of two days in February 2012. Carl D. S., Jr. ("Husband") testified that he and Vicky R. S. ("Wife") had been married for 15 years but that they did not have any children. He said that he was employed full-time as a Senior Substation Technician at Greeneville Light and Power and that he was employed part-time at the Greene County Sheriff's Department. He recalled that his mother contacted him in March 2010 and asked him if he would be interested in adopting the Child. He related that he met the Child in April 2010 at Aunt's house and that after the initial meeting, he and Wife took the Child to their home. He learned that in order to adopt the Child, they needed to obtain legal custody. He recalled that Aunt asked them to return the Child after he requested legal custody. They returned the Child on May 19, 2010, pursuant to a court order.

---

[2]The record reflects that the Child had been placed with Custodial Parents for a period of time at some point in the lengthy history of this case. However, legal and physical custody of the Child was not given to Custodial Parents until December 15, 2010.

Husband testified that in September 2010, a DCS case manager asked him if he would be interested in caring for one of the Children. He recalled that he and Wife met with DCS, Aunt, and Phyllis R. to discuss obtaining custody of the Child. He related that Father also eventually joined the meeting. After the meeting, he and Wife took a drug test, while Father refused to submit a sample. He recalled that they retrieved the Child from Aunt's house after their home study had been completed.[3] He asserted that while he did not obtain legal custody of the Child until December 15, 2010, he had physical custody of the Child since November 22, 2010.

Husband testified that the Parents never submitted child support or offered to support the Child. He recalled that the Parents brought Christmas presents to the Child in December 2010 but asserted that after the Christmas visit, the Parents never returned. He insisted that he did not prohibit or restrict visitation and that he informed the Parents during their only visit that they were welcome to return. He related that Mother attempted to contact the Child one time and that Father spoke with the Child several times when Maxine T. called. He testified that Father never asked to schedule visitation.

Relative to the Child, Husband said that the Child was "a happy four-year old" and that he and Wife did not have any behavioral difficulties with the Child. He said that the Child never asked about the Parents and that he and the Child enjoyed a "pretty good relationship." He related that the Child attended daycare and was learning to count. He asserted that he and Wife were financially able to care for the Child and that their house was more than suitable for the Child. He noted that the DCS home study was favorable and that the Child had his own bedroom. He admitted that he had intended to adopt the Child ever since he obtained custody in April 2010.

Wife testified that she was employed full-time as a unit secretary at a hospital and that she and Husband enjoyed a "great marriage." She related that she and Husband were able to provide a happy and safe home for the Child. She stated that she had "really bonded" with the Child and had a close attachment to the "wonderful little boy." She recalled that the Child was "quiet" and "real timid" when he first came to their home but that the Child established a "real good relationship" with Husband and then eventually "warm[ed]" up to her. She said that since his arrival, the Child was more outgoing and "very comfortable" in the house. She related that the Child also enjoyed daycare.

Relative to the Christmas visit in 2010, Wife stated that neither parent asked her if they could return for visitation or offered to provide financial assistance, clothing, or toys. She stated that neither parent contacted them about visitation after the initial visit. She

---

[3]Susan M. testified that she approved Custodial Parents as proper placements.

admitted that the Child had visited with his siblings and other relatives on at least one occasion. She also admitted that pursuant to her attorney's advice, she did not return the Child for any additional sibling visitation.

Father, who was 42 years old and incarcerated at the time of trial, also testified. However, his testimony was inconsistent and contradictory. Father denied that he abused alcohol and drugs and explained that he was simply dependent on prescription medication for back pain. He stated that he broke his back in a 1996 car accident and needed the medication for the constant pain. He explained that he also suffered from memory loss as a result of the car accident.

When Father was asked about his criminal history, he could not remember how many convictions he had received. The record contained Father's lengthy history of criminal convictions and charges. The record reflected that he had been convicted of driving under the influence ("DUI") at least four times. Additionally, Father was indicted on December 14, 2011 for sale and delivery of a Schedule II Controlled Substance, possession of a Schedule IV Controlled Substance, two counts of possession of a Schedule II Controlled Substance, four counts of attempted second degree murder, and four counts of aggravated assault. He was also charged with statutory rape in 2002. He explained that Mother was 17 years old when they began dating and that the charges were dismissed. He said that Mother had been married previously and was an emancipated minor when they met.

Relative to Father's relationship with Mother, he stated that they were married in November 2002 and insisted that they had only been formally separated twice. When questioned further, he admitted that he and Mother continually moved from place to place and that sometimes, he did not know where she was living. He also admitted that he filed an order of protection against her and that she filed an order of protection against him.

Relative to employment, Father alleged that he worked for the same insulation company for 17 years until he finally quit in 2007. He explained that as a result of his occupation, he aggravated his existing back injury and could no longer work. He had applied for disability but had not been approved. He completed "odd jobs" to support himself. He admitted that he could not support anyone with the income that he received but said that he was "working on trying to" support his family. He could not recall the last time he assisted Mother financially. He admitted that he occasionally drank, regularly bought his prescription medication, and visited a pain clinic monthly even though he felt that he could not assist Mother financially. He explained that his family helped him obtain his medication.

Relative to the Child, Father alleged that he was taking care of him before Mother was incarcerated in 2009. He gave the Child to Aunt because he needed to help Mother get out

of jail. He admitted that he did not retrieve the Child when he realized he could not help Mother. He explained that he did not have transportation or a suitable home. He admitted that the Child spent "more than half of his life" living with other people and that at times, he and Mother had been unable to provide a suitable home for the Child. He said that in his attempt to regain custody of the Child, he completed a parenting class, took an alcohol and drug assessment, completed a mental health evaluation, and quit drinking. He inquired about additional classes and counseling, but DCS did not return his telephone calls.

Relative to child support, Father admitted that he had not provided food for the Child since 2007. He asserted that he gave Aunt clothes, games, and diapers for the Child. He said that he was unable to send Custodial Parents money or clothing because he did not have their address. He later admitted that he did not have any money to send to Custodial Parents.

Relative to visitation, Father asserted that he visited the Child at least "every week" when the Child was staying with Aunt. He stated that he regularly visited Jerrick and Jacob and that he also spoke with the Child approximately once a week. He alleged that he was supposed to visit the Child once a month but that Custodial Parents "never showed up." He admitted that he did not petition the court for visitation but explained that he did not have an attorney. He related that his Christmas 2010 visit with the Child was "pretty good" and that he gave the Child presents that he bought with money he received from the sale of his lawn mower. He insisted that he loved the Child and that he would cooperate with the court in order to regain custody.

Mother, who was 26 years old and incarcerated at the time of the trial, testified that she was 17 years old when she married Father. She related that Father was 32 years old at the time of the marriage. She admitted that she filed an order of protection against Father in 2007. She denied the allegations contained in the petition but ultimately admitted that she signed the petition. She said that while Father did not support her financially, he paid the utility bill "sometimes." She acknowledged that she and Father had been separated at times and that she dated another man for a period of time and believed that she was pregnant with that man's child. She later learned that she was not pregnant.

Mother could not recall the exact number of times she had been in jail, but she admitted that she had been in and out of jail. Her criminal history was also introduced into evidence. The record reflected that she had been charged with various offenses, including criminal impersonation, resisting arrest, and vandalism. She acknowledged that she missed a DCS meeting because she was afraid that she would get arrested for her outstanding warrants while at the meeting. She stated that she was currently in jail, but she believed that she would be released "next month."

Mother admitted that she had been addicted to pain medication but asserted that she was attending a treatment program in jail. She explained that she was in a car accident and took prescription medication to relieve pain from a knee injury. She acknowledged that she took prescription medications while pregnant with the Child and that the Child tested positive for opiates when he was born.

Mother said that she had only been employed twice since 2002 and had not maintained stable employment since 2006. She said that she worked at her grandmother's florist shop from time to time and that she could return to work at the shop once released from jail. She stated that if the Child were returned to her, she would live at her house, which was fully furnished, had four bedrooms, and was an appropriate place to raise the Child.

Relative to the Child, Mother admitted that she was glad that the Child was residing in a stable home. She denied that she told Grandmother that she agreed to the adoption. When confronted with a letter in which she stated that she agreed to the adoption, she initially denied writing the letter but then admitted that she had written the letter. She admitted that she had only provided for the Child for approximately two years before he was placed with family members.

Relative to child support, Mother alleged that she had provided clothing and supplies for the Child when the Child resided with Aunt. She admitted that she did not submit any child support to Aunt or Custodial Parents. She alleged that she gave some items to Grandmother, who promised to give the items to Custodial Parents.

Relative to visitation, Mother acknowledged that she had not seen the Child since Christmas 2010 and that she did not have a relationship with him anymore. She admitted that she could have petitioned the court for visitation but stated that she did not have the money to hire an attorney. She alleged that Custodial Parents refused to bring the Child to his court-ordered sibling visitation and that Custodial Parents never returned her telephone calls.

Grandmother testified that she obtained custody of Jerrick in October 2010. She related that the Parents struggled with alcohol and drug abuse and had been in and out of jail several times. The Children had been "bounced around" since May 2009. She did not know how the Parents supported themselves or the Children but stated that she had paid an electric bill "a time or two." She related that she took Mother to an inpatient treatment program but asserted that Mother left the program shortly thereafter. She testified that neither parent regularly visited Jerrick or submitted child support. She admitted that the Parents called to talk to Jerrick but asserted that they only called after she prompted them to call.

Bill B., Craig B., Carolyn S., and Angie A. each testified that they were familiar with Custodial Parents and that they believed Custodial Parents would provide a loving and suitable home for the Child. Bill B. recalled that the Child was "somewhat reserved when he first came to the home, but now he seems to be a more happy child." Craig B. asserted that Custodial Parents were "very active" with the Child and that they appeared to have a close relationship with the Child. Carolyn S. believed that the Child was "very happy" and had formed a "very close bond" with Husband. Angie A. testified that the Child seemed "more outgoing and happy" since he had been living with Custodial Parents.

Maxine T. testified that she was the Child's paternal grandmother and that Jacob was living with her. She said that Father visited Jacob "[m]ost often as he can" and that she never had problems with his visitation. She stated that while Father had not supported Jacob financially, he bought "clothes and stuff" for him "all the time." She sought custody of Jacob, Jerrick, and the Child, but she was only granted custody of Jacob.

Aunt testified that she wanted to keep the Child but that "it didn't quit work out like that." She said the Child had only attended one sibling visitation and that after that visitation, Custodial Parents "wouldn't answer the phones." She insisted that Mother had "changed" and that Mother would be a "good mom" once released from jail. She stated that she would continue to care for the Children until Mother was able to care for them.

Following the hearing, the trial court found that Father was not a credible witness. The court also found that the Parents abandoned the Child by failing to visit and by failing to provide child support and a suitable home; that they failed to comply with the requirements contained in the safety plan; and that the conditions which led to removal persisted. Finding several statutory grounds supporting the termination of parental rights, the court also found that termination of Mother and Father's parental rights was in the best interest of the Child. In so holding, the court stated that the relevant best interest factors "overwhelming support" the finding that termination was in the best interest of the Child. This timely appeal of the court's best interest finding followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by the Parents as follows:

A. Whether termination of Mother's parental rights was in the best interest of the Child.

B. Whether termination of Father's parental rights was in the best interest of the Child.


## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination will support the trial court's

decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim*. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).

## IV. DISCUSSION

## A. & B.

The Parents concede that several statutory grounds supported the termination of their parental rights. We agree that clear and convincing evidence supported the termination of parental rights based upon the persistence of conditions which led to removal and abandonment for failure to visit and support the Child. *See* Tenn. Code Ann. § 36-1-113(g)(1), (3). Having concluded that there was clear and convincing evidence supporting a statutory ground for termination, we must consider whether termination of Mother and Father's parental rights was in the best interest of the Child. *See* Tenn. Code Ann. § 36-1-113(c). In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

-11-

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In this case, a number of the best interest factors weigh against the Parents. The Parents refused to make the changes necessary to adequately care for the Child and were in jail at the time of the trial. Tenn. Code Ann. § 36-1-113(i)(1). Likewise, the Parents failed to make a lasting adjustment of their circumstances as evidenced by their incarceration. Tenn. Code Ann. § 36-1-113(i)(2). The Parents failed to regularly visit the Child and had only seen the Child once since December 2010. They blamed their failure to visit on others, specifically they alleged that they did not have an address for Custodial Parents even though they had visited the house on a prior occasion. Mother also alleged that Custodial Parents did not return her telephone calls. Tenn. Code Ann. § 36-1-113(i)(3). The Parents admitted that they no longer had a relationship with the Child because it had been so long since their last visit. Tenn. Code Ann. § 36-1-113(i)(4). The Parents also admitted that they never submitted child support or any amount of monetary support, despite their ability to adequately care for themselves and obtain prescription medications. Tenn. Code Ann. § 36-1-113(i)(9).

Additionally, the Child presently resides in a safe and stable home and has bonded with Custodial Parents, who are willing to adopt him. Removing the Child from the only

stable home he has ever known and returning him to the Parents when they would be able to care for him would likely traumatize the Child. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to whether the physical environment of Mother's potential home would be safe given her repeated incarcerations and lack of responsibility for her actions. Tenn. Code Ann. § 36-1-113(i)(7). Likewise, Father never had an established home and constantly moved from house to house. Father admitted that he left the Children with others on occasion because he did not have room for them. Tenn. Code Ann. § 36-1-113(i)(7).

We acknowledge that Mother has taken advantage of an inpatient treatment program while she is presently incarcerated. However, we believe the above considerations overcome Mother's limited improvement. Her improvement is simply too little, too late. Likewise, Father maintained telephone contact with the Child and completed some of the requirements in the safety plan. His limited contact with the Child was not enough to safeguard his bond with the Child, and despite the appearance of improvement in 2009, he was incarcerated at the time of the trial in 2012. While we do not wish to discount the fact that termination of Mother and Father's parental rights to the Child will likely affect the Child's ability to maintain his bond with his siblings, the Children had been separated for quite some time prior to the filing of the petition to terminate Mother and Father's parental rights. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother and Father's parental rights was in the best interest of the Child. Accordingly, we affirm the termination of Mother and Father's parental rights to the Child.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to one-half to the appellant, Ashley A., and one-half to the appellant, Jerry L. A.

_____
JOHN W. McCLARTY, JUDGE

-13-